J-S13019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| ROBERTO TORNER | : | |
| | : | |
| Appellant | : | No. 13 MDA 2024 |

Appeal from the Judgment of Sentence Entered August 24, 2023
In the Court of Common Pleas of Luzerne County Criminal Division
at No(s): CP-40-CR-0002079-2020

BEFORE: PANELLA, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY KUNSELMAN, J.: **FILED: APRIL 1, 2026**

Roberto Torner appeals his judgment of sentence for murder of the first degree, conspiracy, and solicitation[1] following a remand from the Supreme Court of Pennsylvania. We reconsider our ruling that the trial court did not abuse its discretion by allowing witness Richard DeStefano to testify that Torner told him that Torner previously participated in dismembering bodies. Informed by new Supreme Court precedent, we conclude that admission of this evidence was a proper application of Pennsylvania Rule of Evidence 404(b). We therefore affirm.

This Court first affirmed Torner's judgment of sentence on July 10, 2025. ***Commonwealth v. Torner***, 344 A.3d 1091 (Table), 2025 WL 1905486 (non-

---

[1] 18 Pa.C.S. §§ 2502(a), 903, and 902(a), respectively.

precedential decision). We adopted the trial court's recitation of facts from trial:

Jose "Pepe" Herran disappeared in the late fall of 2015. Neither his family, nor his parole officer, Gisella Bassolino, had any idea where he was. He was born in Cuba, but his last known address was 559 Washington Street, Freeland, Pennsylvania, a boarding house, and apartment building then known as "the cottage." The cottage was owned by [Torner].

While investigating Mr. Herran's disappearance, investigators became aware that he last used his cellular telephone on October 21, 2015, in the area of Freeland Borough. Investigators also learned that the cottage was his last known address and that he was acquainted with [Torner]. After years without leads in the investigation, Donald Warren, a former resident of the cottage and sometime employee of [Torner], told police that he knew what had happened to Jose Herran.

Warren told police that he knew that Herran was killed by [Torner] and David Alzugaray sometime in the fall of 2015. He related that [Torner asked him at least 25 times] to participate in the killing[. The night that Herran disappeared, Torner was driving a van with Alzugaray in the passenger seat. Torner told Warren, "we are going to do this right now. It's now or never." Torner smiled and showed Warren a .22 caliber revolver in his waistband. Warren, who was ill, refused to join them. Mr. Herran got in the van, and Torner drove away.] Later that same night, [Torner] and Alzugaray returned to the cottage without Mr. Herran, wearing different clothes and smelling like fuel oil and smoke. That same night [Torner] and Alzugaray regaled Warren with a macabre story about the details of the killing and dismembering of Jose Herran. It was later determined that Mr. Herran's remains were thrown into the Lehigh River.

[Torner] had also shown Warren a collection of butcher knives, cleavers and a machete which he said were used to dismember Herran. Later, [Torner] gave Warren his .45 caliber model 1911 firearm and directed him to clean it with bleach and ammonia and mutilate the gun's serial numbers and the rifling of the barrel.

Investigators interviewed Alzugaray at the Lackawanna County Jail on May 1, 2018. Alzugaray confessed to killing Jose

Herran. He told investigators that he shot Herran with a .22 caliber pistol, burned his clothes, dismembered his body, and threw the remains into the Lehigh River. Alzugaray told investigators that the killing took place at 6851 North Buck Mountain Road, a property owned by [Torner], who, he assured investigators, had nothing to do with the killing. A search of a burn pit on the Buck Mountain Road property resulted in investigators recovering fragments of human bones. The human skull fragments looked like they had been burned and that they most likely belonged to a male.

Special Agent Larry Whitehead interviewed [Torner] about Jose Herran's disappearance in February of 2018. During that interview, [Torner] coyly spoke in hypotheticals about a missing "item" which he said he believed was chopped up into little pieces. Months later, [Torner] was again interviewed by law enforcement. At that time he related that he knew about the murder of Jose Herran. He reported that one night in the fall of 2015 he went to his North Buck Mountain Road property just after Alzugaray killed Herran. He stated that Alzugaray told him that Herran attacked him and that as he was running away from Herran shooting over his shoulder a bullet from his gun struck Herran in the head killing him. [Torner] offered the same explanation to the jury at his trial.

Alba Veras, an associate of [Torner], told police where the dismemberment tools and other weapons used in the homicide were. She took investigators to them in the attic of a former church which was owned by [Torner]. Veras reported to police that she concealed the cleavers and other dismemberment tools at the direction of [Torner]. She also led police to the location of two guns which were hidden in a hollow cavity of a railing near the altar in the church. Prior to the killing of Herran, [Torner] had, as he had with Mr. Warren, asked Veras to kill Jose Herran, insinuating that by doing so she would prevent future crimes that [Torner] said he knew Herran was preparing to commit.

*Id.* at *1–2.

In addition to the above evidence, Richard DeStefano testified over objection that Torner told him that when he was younger in New Jersey, he "was present when they would chop up bodies and put them in a drain basically." N.T., Trial, 5/9/23–5/18/23, at 916–17. DeStefano clarified, after

his memory was refreshed, that Torner told him he was not merely present but would "also participate in cutting up the bodies." *Id.* at 919. Additionally, DeStefano testified that Torner asked him to build an incinerator: "[Torner] said they had an opportunity to make a lot of money, but they would need a way to get rid of the body and they needed an incinerator." *Id.* at 920.

On direct appeal, we initially ruled the evidence—including Torner's own statement to Warren that he killed the victim and helped mutilate the body— was sufficient to sustain Torner's convictions. *Torner*, 2025 WL 1905486, at *3–5. We then concluded that the trial court did not abuse its discretion by allowing DeStefano to testify that Torner told him that he participated in dismembering bodies when he lived in New Jersey. *Id.* at *6–7.

On February 19, 2026, the Supreme Court of Pennsylvania vacated our order and remanded for reconsideration in light of *Commonwealth v. Walker*, _ A.3d _, 2026 WL 247429 (Pa. Jan. 28, 2026). *Commonwealth v. Torner*, No. 398 MAL 2025, 2026 WL 468792 (Table). In *Walker*, our high court held that the "common plan, scheme, or design" purpose for introducing evidence of a defendant's "other crimes, wrongs, or acts" under Rule 404(b) is limited to two circumstances: "either (1) the offenses constitute 'signature crimes'—that is, they are so unique and distinctive that they must have been committed by the same perpetrator—or; (2) the offenses were linked to achieve a common goal." *Walker*, _ A.3d _, 2026 WL 247429, at *16.

Here, the evidence that Torner previously participated in dismembering bodies in New Jersey was offered to show a "common plan, scheme, or design"

under Rule 404(b)(2) and is thus subject to a **Walker** analysis. We conclude that Torner's prior acts were admissible as "signature crimes." While Torner did not provide many details to DeStefano—just that the bodies were cut up and put in a drain—Torner himself was the source of DeStefano's information. The reason the offenses were "so unique and distinctive that they must have been committed by the same perpetrator" was that Torner himself told other witnesses he committed the offenses. Just like Torner described to DeStefano how he participated in dismembering bodies in New Jersey, Torner described to Warren how he participated in the killing and dismembering of the victim in this case. Torner's "signature," the proof of his involvement in the past and present offenses, was his own words. Because the evidence was admissible to show Torner's identity as the perpetrator of "signature crimes" under Rule 404(b)(2) and **Walker**, the trial court did not abuse its discretion in allowing its admission. Torner's evidentiary issue fails.

Our analysis of Torner's other issue, regarding the sufficiency of the evidence, did not implicate Torner's statement to DeStefano. **Torner**, 344 A.3d 1091 (Table), 2025 WL 1905486, at *3–5. We thus determine it to be unaffected by the new rule of **Walker**. Torner's sufficiency issue fails.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/1/2026